UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBIN DASENBROCK,<br><br>      Plaintiff,<br><br>  vs.<br><br>A. ENENMOH, et al.,<br><br>      Defendants. | 1:11-cv-01884-DAD-GSA-PC<br><br>**FINDINGS AND RECOMMENDATIONS, RECOMMENDING THAT DEFENDANT ADAIR'S MOTION FOR SUMMARY JUDGMENT BE GRANTED (ECF No. 224.)**<br><br>**OBJECTIONS, IF ANY, DUE WITHIN FOURTEEN (14) DAYS** |

## I.    BACKGROUND

Robin Dasenbrock ("Plaintiff") is a state prisoner proceeding pro se and in forma pauperis with this civil rights action pursuant to 42 U.S.C. § 1983. Plaintiff filed the Complaint commencing this action on November 14, 2011. (ECF No. 1.) This case now proceeds with Plaintiff's Second Amended Complaint ("SAC"), filed on September 8, 2015, against defendants Dr. A. Enenmoh, Correctional Officer Perez-Hernandez, Nurse Page, and Nurse Laura Adair, on Plaintiff's claims for violation of the Eighth Amendment and related state-law negligence. (ECF No. 140.)

On April 14, 2017, defendant Nurse Laura Adair ("Defendant") filed a motion for summary judgment.[1] (ECF No. 224.) On May 30, 2017, Plaintiff filed an opposition to the motion. (ECF No. 238.) On August 31, 2017, Defendant filed a reply to the opposition. (ECF No. 263.) The motion has been submitted upon the record without oral argument pursuant to Local Rule 230(*l*), and for the reasons that follow, Defendant's motion should be granted.

## II.    SUMMARY JUDGMENT STANDARD

Any party may move for summary judgment, and the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a) (quotation marks omitted); Washington Mut. Inc. v. U.S., 636 F.3d 1207, 1216 (9th Cir. 2011). Each party's position, whether it be that a fact is disputed or undisputed, must be supported by (1) citing to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1) (quotation marks omitted). The Court may consider other materials in the record not cited to by the parties, but it is not required to do so. Fed. R. Civ. P. 56(c)(3); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001); accord Simmons v. Navajo Cnty., Ariz., 609 F.3d 1011, 1017 (9th Cir. 2010).

Defendant does not bear the burden of proof at trial and in moving for summary judgment, she need only prove an absence of evidence to support Plaintiff's case. In re Oracle Corp. Sec. Litig., 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548 (1986)). If Defendant meets her initial burden, the burden then shifts to Plaintiff "to designate specific facts demonstrating the existence of genuine issues for trial." In re Oracle Corp., 627 F.3d at 387 (citing Celotex Corp., 477 U.S. at 323). This requires

///

---

[1] Concurrently with her motion for summary judgment, Defendant Adair served Plaintiff with the requisite notice of the requirements for opposing the motion. Woods v. Carey, 684 F.3d 934, 939-41 (9th Cir. 2012); Rand v. Rowland, 154 F.3d 952, 960-61 (9th Cir. 1998). (ECF No. 224-5.)

Plaintiff to "show more than the mere existence of a scintilla of evidence." Id. (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505 (1986)).

In judging the evidence at the summary judgment stage, the court may not make credibility determinations or weigh conflicting evidence, Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007) (quotation marks and citation omitted), and it must draw all inferences in the light most favorable to the nonmoving party and determine whether a genuine issue of material fact precludes entry of judgment, Comite de Jornaleros de Redondo Beach v. City of Redondo Beach, 657 F.3d 936, 942 (9th Cir. 2011) (quotation marks and citation omitted). The court determines only whether there is a genuine issue for trial. Thomas v. Ponder, 611 F.3d 1144, 1150 (9th Cir. 2010) (quotation marks and citations omitted).

## III. SUMMARY OF PLAINTIFF'S ALLEGATIONS AGAINST DEFENDANT ADAIR IN THE SECOND AMENDED COMPLAINT (SAC)[2]

Plaintiff is a state prisoner presently incarcerated at Mule Creek State Prison. During the events at issue in the SAC, Plaintiff was incarcerated at the California Substance Abuse Treatment Facility (SATF) in Corcoran, California, and defendant Laura Adair was a Nurse at SATF. Defendant Adair worked at E-Yard medical clinic on January 2, 2010, during third watch at the A-L window.

Beginning in 2007, Plaintiff suffered from rectal bleeding from internal hemorrhoids. Three and a half years later, on December 30, 2009, hemorrhoidectomy surgery was performed, but Plaintiff did not improve. He continued to bleed from the rectum.

On January 2, 2010, three days after Plaintiff's hemorrhoidectomy, defendants Adair and Perez were working at the E yard medical clinic, at the A-L window. Plaintiff went to the medical clinic because he had not had a bowel movement. He approached the medical window and noticed his name on the cold medication pick-up list. (SAC, ECF No. 140 at 46 ¶101.)

---

[2] Plaintiff's complaint is verified and his allegations constitute evidence where they are based on his personal knowledge of facts admissible in evidence. Jones v. Blanas, 393 F.3d 918, 922-23 (9th Cir. 2004). The summarization of Plaintiff's claim in this section should not be viewed by the parties as a ruling that the allegations are actually true or not, or admissible at trial. The Court will address, to the extent necessary, the admissibility of Plaintiff's evidence in the sections which follow.

Plaintiff knew that "doctors had prescribed a large number of meds post surgery: laxatives, pain meds, antibiotics, etc." (Id. at 108:11-16.)[3]  Plaintiff approached the A-L window and asked for his medications.  Defendant Adair could not find Plaintiff's medication and told Plaintiff he had no medications.   Plaintiff told her he had just had surgery and pointed to his name on the list, saying he must have medication.  Defendant Adair became angry and ordered Plaintiff away from the window.  Plaintiff complained that he was just out of surgery, in severe pain, had not had a bowel movement in three days, was bleeding profusely from the rectum, and wanted to "check in" to medical, go to CTC, or go back to the hospital.  (Id. at 19:11, 28:26-29:1.)

C/O Perez then got involved, approached Plaintiff from inside medical, talking to him outside, and angrily ordered Plaintiff away from the window.  Plaintiff again complained, "but I'm bleeding from the rectum," and C/O Perez "made a joke to go tell his block officers like he had been violated" sexually, and again ordered Plaintiff away from medical or he would receive a 115 disciplinary write up.  (Id. at 19:13-15; 29:5-10.)  C/O Perez's remarks made all the prisoners in the medication line, and the guard outside, laugh.  Plaintiff refused and said to both Adair and Perez, "I want to check into medical."  (Id. at 29:11.)  Plaintiff alleges that Adair and Perez did not follow their own regulations and protocols when Plaintiff requested medical assistance.  (Id. at 26:21-23.)   No medical help was given and Plaintiff had to spend the night in severe pain and bleeding until the next day when he returned again to the medical clinic, received the antibiotics dated the previous day, and also received a one-use enema kit to temporarily help with the constipation.  (Id. at 29:18-23.)  On January 2, 2010, Plaintiff filed a 602 appeal concerning C/O Perez's and defendant Adair's actions.  (Id. at 48 ¶126.)  At the top of the 602, prison officials stamped the words "non emergency", even though Plaintiff stated how dire his condition was.  (Id.)

Plaintiff was not allowed to see any attending physician or qualified medical staff even though, according to the CMO who responded to Plaintiff's 602 appeal, one was available 24

---

[3] All page numbers cited herein are those assigned by the court's CM/ECF system and not based on the parties' pagination of their briefing materials

4

hours a day. (Id. at 49 ¶131.) "Urgent and emergent response" section B states that inmates may at any time express to any CDC employee their concerns regarding a condition they believe warrants urgent or emergent care, and medical staff is available 24 hours a day. (Id. at 47-48 ¶121.)

Because of his blood loss, Plaintiff developed severe anemia with resulting heart complications – sharp stabbing pains in the chest, shortness of breath, dizziness, tiredness, weakness, etc. – and Plaintiff had to be rushed to the Bakersfield Hospital emergency room for life-saving blood transfusions. (Id. at 24:9-13.)

Based on these allegations, Plaintiff brings claims for violation of the Eighth Amendment and negligence.

## IV. DEFENDANT'S FACTS[4]

Plaintiff Robin Dasenbrock (E92288) ("Dasenbrock") is an inmate in the custody of the California Department of Corrections and Rehabilitation (CDCR), who is currently incarcerated at Mule Creek State Prison in Ione, California. (Plaintiff's change of address, ECF No. 179.) At all times relevant to the allegations in the Second Amended Complaint, Dasenbrock was incarcerated at SATF. (SAC, ECF No. 140.)

On January 2, 2010, Dasenbrock entered the Facility E Medical Clinic for a prescription. (Id. at 19.) Dasenbrock was told by Adair that there were no prescriptions available for him at the time of his visit and ordered him away from the window. (Id.) During third watch on January 2, 2010, Adair was a nurse at the Facility E Medical Clinic. (Adair Decl., ECF No. 224-4 ¶4.) As a nurse, Adair cannot prescribe medication or diagnose further treatment. (Id.) If an inmate believes he has not received adequate medical treatment he must submit a CDCR Form 7362 healthcare request. (Id.) If the prescribed medication was at the clinic, ready for distribution, and if Dasenbrock was on the distribution list, he would have been given the medication. (Id. ¶6.)

///

---

[4] Summarized from Defendant's Statement of Undisputed Facts 1-28, ECF No. 224-2 at 1-4.

The nursing log for Facility E Medical Clinic for January 2, 2010, indicates that Nurse Cush was brought in to distribute KOP ("keep on person") medications, which includes the medication Dasenbrook was prescribed. (Id. ¶7; Jones Decl., ECF No. 224-3 ¶2, Exhibit A.) The log further reveals all medication distribution during the third watch was halted due to an emergency inmate lockdown procedure, and four boxes of KOP medications were not distributed to patients as a result. (Adair Decl. ¶8; Jones Decl. ¶2, Exhibit A.)

During third watch on January 2, 2010, C/O Perez was a Health Care Access Officer at the Facility E Medical Clinic. (Perez Decl., ECF No. 208-6 ¶4.) As a Health Care Access Officer, Perez-Hernandez was responsible for assisting inmates with access to treatments and maintaining security within the Medical Facility. (Id. ¶5.) As a Health Care Access Officer, Perez-Hernandez monitored the interactions and treatments of inmates by medical staff at the treatment window. (Id.) When an inmate arrives at the treatment window, common practice is for the Health Care Access Officer to not interfere with the inmate's interaction with staff. (Id. ¶7.) It is outside the scope of a Health Care Officer's duties to advise the inmate which prescriptions are available to him at any moment in time. (Id.) Common practice for a Health Care Officer is to order an inmate to leave the Medical Facility at the conclusion of their visit with medical staff. (Id. ¶8.) Perez-Hernandez ordered Dasenbrock to leave the treatment window at the conclusion of his visit. (SAC, ECF No. 140 at 19.) Perez-Hernandez instructed Dasenbrock that he would receive an RVR if he did not leave the facility. (Id.) Dasenbrock complied with the order and left the medical facility. (Id.)

Dasenbrock did not sustain any injury between January 2, 2010 and February 3, 2010 as a result of the delay in his medications. (Ugwueze Decl., ECF No. 208-5 ¶13.) Dasenbrock received portions of his post-op prescription, including Tylenol No. 3, on January 5, 2010. (Id. ¶¶7(e), 11.) As part of his post-op discharge on December 31, 2009, Dasenbrock received Motrin, Tylenol No. 3, Cephalexin, and Tucks briefs. (Id. ¶¶7(b)-(e).) Dasenbrock made no complaints of aggravated post-op injury at a January 7, 2010 follow-up appointment. (Id. ¶7(f).) Dasenbrock did not complain of exacerbated post-op issues at a January 13, 2010 follow-up appointment. (Id. ¶7(g).) By February 3, 2010, Dasenbrock presented with no

complaints, minimal swelling to his rectal area, and healed rectal tissue. (Id. ¶7(h).) The pain and bleeding that Plaintiff suffered from January 2, 2010 on is expected, given the type of surgery he had. (Id. ¶8.) Resolution of acute pain following a hemorrhoidectomy may take several days to a few weeks. (Id.) The process of healing the surgical wound and modeling of the wound to restore tissues can take months. (Id. ¶8.) Dasenbrock's treatment records reflect that he recovered under the acceptable recovery time for a hemorrhoidectomy. (Id. ¶¶8, 10, 13; Jones Decl. ¶3, ECF No. 224-3, Exhibit B.)

## V. PLAINTIFF'S RESPONSE[5]

I, Plaintiff Robin Dasenbrock (E92288), am an inmate in the custody of the CDCR, currently incarcerated at Mule Creek State Prison in Ione, California. (Notice of change of address, ECF No. 179.) I was housed at SATF on Facility E on January 2, 2010, during this incident involving defendant Adair. (Plaintiff's Response ("P's Resp."), ECF No. 238 at 57 ¶3.)

On January 2, 2010, I was in severe post-surgical pain, excessively bleeding, constipated, and my painful bloody bowel movements were not normal. (Plaintiff's Declaration ("P's Decl."), ECF No. 238 ¶2.) I also had a serious infection at the site of the incision of my hemorrhoidectomy. (Id.) My bleeding symptoms were visible, including a loose stitch at the surgical site, as well as bleeding from the rectum. (Id., Exh. 22, ECF No. 238 at 90.) My symptoms were acute and required immediate attention, per the hospital discharge orders. (Id., Exh, 2, ECF No. 238 at 70.)

On January 2, 2010, I went to the Facility E medical clinic and stood outside the facility at the medication pick-up window, after standing in line with other prisoners who also were waiting and receiving medications. (P's Response ¶4.) When an inmate goes to the medical clinic to pick up his KOP meds, there are two lines to stand in, one for inmates whose last names begin with A-L, and the second for inmates whose last names begin with M-Z. (Id. ¶8.)

---

[5] Summarized from Plaintiff's Undisputed Facts (ECF No. 238 at 51), Response to Defendant's Statement of Undisputed Facts, (ECF No. 238 at 56), and Plaintiff's Declaration (ECF No. 238 at 64). These documents were signed by Plaintiff under penalty of perjury.

Therefore, there are two nurses passing out medications in two lines, and defendant Adair was working the A-L window as stated in the nursing log book.  (Id., Exh. 3, ECF No. 238 at 71; P's Decl. ¶3.)

I put defendant Adair on notice of my serious medical needs, as is corroborated by declarant Burton.  (P's Decl. ¶10; Decl. of Shawn Burton ("Burton Decl."), ECF No. 238 at 72 ¶¶4, 5.[6])  Defendant Adair became angry and told me to get away from the window, that I had no meds.  (P's Response ¶5; SAC at 28:24; Burton Decl. ¶4.)  I pointed to my name on the medication list.  (P's Decl. ¶7.)  My medication was at the clinic awaiting delivery, yet defendant Adair refused to provide it to me.  (Id., Exh. 3, ECF No. 238 at 71.)  My medication was at the clinic ready for distribution, and I was on the distribution list, yet I was not given my post surgically prescribed medications.  (P's Response ¶7.)

Inmates who have urgent needs for health care do not have to submit a CDCR 7362 form.  (P's Decl. ¶4.)  The CDCR Protocol says that a patient is supposed to be assessed for the urgency of the complaint.  (Id.; Exhs. 6-7, ECF No. 238 at 75-76.)  "If urgent, the patient shall be taken to an examination room for evaluation and a complete assessment performed, including vital signs."  (Id.)  Defendant Adair has declared that her duties were to provide medications or referrals for more thorough review of symptoms for inmate patients who came to the treatment window.  (Adair Decl., ECF No. 224-4 ¶4.)  Nurse Protocols allow that "health care staff shall document the evaluation on a CDCR form 7230 interdisciplinary progress note or CDCR form 7403 Emergency Care flow sheet or RN encounter sheet."  (P's Decl. ¶4., Exh. 26, ECF No. 238 at 94.)  If someone was unconscious, CDCR personnel would still treat him, even without a signed form.  (P's Response ¶7.)  Defendant Adair described her role as a gatekeeper: "If an inmate requested medical assistance, he would be referred to medical personnel capable of performing an evaluation of his complaints."  (Id. ¶6, Exh. Deft's Response to Interrogatory #12, ECF No. 238 at 156.)  Per the inmate medical services program

---

[6] Burton declared, "The nurse then became angry and yelled at Dasenbrock to get away from the window.  I heard Dasenbrock say there was something wrong, he was bleeding from the rectum and he wanted to see a doctor."  (Burton Decl., ECF No. 238 at 72 ¶¶4, 5.)

policies and procedures (2006) volume 4, chapter 12, Urgent and emergent response, section B, "inmate/patients may at any time express to any CDC employee their concerns regarding a condition they believe warrants Urgent or emergent care." (P's Response ¶6.) CDCR Protocol states that Health care services provide care to all inmate/patients which is necessary to protect life, prevent significant illness, or to alleviate significant pain, and all requests for health care shall be assessed by health care staff to determine the priority. (Id., Exh. 28; title 15 § 3350 (b)(1).)

Nurses routinely prescribe medications for inmates, be it Tylenol or antifungal creams, etc., that do not require a doctor's prescription. (P's Decl. ¶5.) CDCR Nurses also diagnose further treatment. (Id. ¶6; P's Response ¶6.) The Business and Professional Code 2038 states that whenever the words diagnose or diagnosis are used in that chapter, they include any undertaking by any method, device, or procedure whatsoever . . . to ascertain or establish whether a person is suffering from any physical or mental disorder [and] also include the taking of a person's blood pressure and the use of mechanical devices for the purpose of making a diagnosis and representing to such person any conclusion regarding his or her physical or mental condition. (Id.) Therefore, once defendant Adair takes a patient's blood pressure to ascertain whether the patient is suffering from any physical disorder, and does so, she has just diagnosed the patient. (P's Decl. ¶6.) CDCR nurses routinely take a person's blood pressure and prescribe medications like Tylenol, antibacterial creams, cold compresses, etc., to treat conditions. (Id.) The Nurse's Protocol provides that "[t]he term diagnosis implies the identification of a patient's problem and the treatment that a nurse can legally manage." (P's Response ¶6, Exh. 7, ECF No. 238 at 75 ¶V.)

The nursing log book shows that defendant Adair was assigned to the A-L window and only she was authorized to dispense medications to me. (P's Decl. ¶8, Exh. 3, ECF No. 238 at 71; P's Response ¶8.) I do not believe that at all times relevant to my allegations defendant Adair was a Registered Nurse, because medical logs show that she signed in as LVN (Licensed Vocational Nurse) Adair. (P's Decl. ¶11.) The nursing log book does not say that Nurse Cush ///

would have dispensed any medications. (P's Decl. ¶8.) The log book states, "Nurse Cush came to help with cold meds," not to distribute KOP medications. (P's Response ¶8.)

The log book does not state that medication distribution was halted due to an emergency lockdown procedure. (P's Decl. ¶9.) Instead it states, "Controlled release of inmates due to fog," followed by defendant Adair's signature, which means the inmates are released a building at a time for dinner and pill call due to fog conditions. (Id., Exh. 3, ECF No. 238 at 71; P's Response ¶9.) During an emergency inmate lockdown, there is no movement; inmates are locked down in their cells and fed meals in their cells; and medications are also brought to the buildings in that event, which did not happen. (P's Response ¶9.)

During third watch on January 2, 2010, C/O Perez was a Health Care Access Officer at the Facility E Medical Clinic. (Adair Decl., ECF No. 224-4 ¶4.) As a Health Care Access Officer, Perez-Hernandez was responsible for assisting inmates with access to treatments, and maintaining security within the Medical Facility. (Id.) When an inmate arrives at the treatment window, common practice is for the Health Care Access Officer to not interfere with the inmate's interaction with staff. (Perez Decl., ECF No. 208-6 ¶7.) Defendant Perez-Hernandez was not assigned to monitor the interactions and treatment of inmates by medical staff at the treatment window. (P's Response ¶12.) That was the job of the Guard posted outside the medical clinic at the treatment window (Post #353750 E Yard S&E C/O Aldrich, Jr., M.I.) (Id.) Defendant Perez took it upon himself to intervene from within the medical clinic where he was posted. (Id.) It is not outside the scope of a health care officer's duties to advise an inmate which prescriptions are available to him if the health care officer's job is to monitor the interactions of treatments of inmates by medical staff at the treatment window, and that officer overhears an inmate saying he is post surgery and on the KOP medication for pick up list, sees the inmate point to his name on the KOP list and hears the nurse refusing to provide prescribed medications. (Id. ¶14.) It is not common practice for a health care officer to order an inmate to leave the medical facility at the conclusion of their visit with medical staff. (Id.) Common practice is for medical staff to do so only after the inmate has been appropriately evaluated. (Id.; Exh. 12, ECF No. 238 at 80.) Perez-Hernandez ordered Dasenbrock to leave the treatment

window at the conclusion of his visit. (SAC, ECF No. 140 at 19.) Perez-Hernandez instructed Dasenbrock that he would receive an RVR if he did not leave the facility. (Id.) Dasenbrock complied with the order and left the medical facility. (Id.)

I sustained injury between January 2, 2010, and February 3, 2010, as a result of the delay in receiving my medications, as shown in the record. (P's Decl. ¶12; P's Response ¶19.) I stated in my 602 appeal #10-10040 on January 2, 2010, "I haven't had a good bowel movement in 3 days and do still bleed from the rectum. . . I simply tried to get my meds in the hopes the pain would be alleviated or check into the hospital due to the rectal bleeding." (P's Decl. ¶12(a); P's Response ¶19(a); Exh. 9, ECF No. 238 at 77.) On January 4, 2010, Dr. Metts felt that my pain was so serious he prescribed Tylenol-3 (an opiate) for four days to relieve some of the pain. (P's Decl. ¶12(a); P's Response ¶19(b); Exh. 21, ECF No. 238 at 89.) Plaintiff did not receive Tylenol-3 until January 6, 2010, eight days after his surgery. (P's Response ¶19(c); Exh. 18, ECF No. 238 at 86.) On January 13, 2010, Dr. Parvez reported that there was a stitch hanging loose and "[p]atient still has some occasional bleeding from the rectum," after I complained of excessive bleeding and constipation. (P's Decl. ¶12(a); P's Response ¶19(d); Exh. 22, ECF No. 238 at 90.) Dr. Parvez also noted the "patient's stool is still hard" (which was two weeks after surgery) and prescribed Milk of Magnesia to go along with the Colace I was already on. (Id.) There was a stitch hanging loose. (Id.) On February 2, 2010, I submitted a CDCR 7362 form to SATF medical documenting my complaints of shortness of breath and dizziness (I was receiving chronic care for my heart). (P's Decl. ¶13; P's Response ¶19(e); Exh. 16, ECF No. 238 at 84.) On September 3, 2010, Dr. Metts told me that severe loss of blood can bring about these symptoms. (Id.; Exh. 57, ECF No. 238 at 125.) On February 3, 2010, Dr. Parvez reported, "After a bowel movement there is still an element of bleeding that happens." (P's Decl. ¶12(a); P's Response ¶19(f); Exh. 53, ECF No. 238 at 121.) On December 31, 2009, I did not receive Cephalexin, Tucks Briefs, Motrin, or Tylenol-3 as part of my post-op discharge; I only received Motrin at the hospital. (P's Response ECF No. 238 at 61 ¶21; Exhs. 70-71 at pp. 138-139.) All other medications were prescribed on December 30, 2009 and expired at 2100 hours on December 30, 2009. (Id.) I complained

about post-op injuries at my January 7, 2010, follow-up appointment. (P's Response ¶22.) The problem is it fell on deaf ears. (Id.) I had two ducats scheduled for the same day, and since I must fill out a refusal form and since the corrections officer that hands the inmate the form is not qualified to evaluate inmate complaints, who should the inmate complain to when he is not allowed to see medical staff? (Id.) I complained to a nurse, to no avail. (Id.) Additionally, no documentation was provided by the defendants to verify their claims that I did not complain. (Id.) I complained about exacerbated post-op issues at the January 13, 2010, follow-up appointment with Dr. Parvez, specifically expressing that I was bleeding from the rectum and constipated, which the doctor notes. (P's Response ¶23; Exh. 22, ECF No. 238 at 90.) The doctor also noted there was a stitch hanging loose. (Id.)

On February 3, 2010, I presented with a complaint to Dr. Parvez about continuing bleeding which the doctor noted. (Id. ¶24; Exh. 53, ECF No. 238 at 121.) Dr. Parvez noted that I was "healing well" which connotates I had not yet "healed." (Id.) The pain and bleeding I suffered from on January 2, 2010 is not expected given the type of surgery I had. In fact, the hospital discharge instructions specifically warned that if increased bleeding or pain were exhibited to call the physician's office or emergency room. (P's Decl. ¶13; P's Response ¶25; Exh. 2, ECF No. 238 at 70.) The hospital would not have issued these warnings if pain and bleeding were expected. My treatment records reflect that I did not recover under the acceptable recovery time for hemorrhoids: I continued bleeding and between February 19-23, 2010, had to be rushed to the hospital for a blood transfusion, and had another colonoscopy that found internal hemorrhoids and diverticulosis. (Id. ¶28; Exhs. 20, 31, ECF No. 238 at 88, 99.) On April 27, 2011, I was referred for another colonoscopy (Exh. 74, ECF No. 238 at 142); on July 7, 2011, for surgery (Exh. 55, ECF No. 238 at 123); on April 18, 2010, for a doctor's assessment, with diagnosis of severe rectal bleeding, and anemia (Exh. 56, ECF No. 238 at 124); on May 17, 2010, a doctor's assessment, with diagnosis of rectal bleeding fissure (Exh. 57, ECF No. 238 at 125); and on May 4, 2011, Dr. Parvez, the same doctor who performed the first hemorrhoidectomy five months prior documented: "local examination reveals one anal fissure and after that an anal fistula also" and recommends, "the patient is to have surgery

which would include flexible sigmoidoscopy, anal fistulectomy with removal of fissure, possible internal hemorrhoidectomy (Exh. 73, ECF No. 238 at 141). All of the exhibits I have submitted are self-authenticating. (P's Decl., ECF No. 238 ¶15.) I received them from the Attorney General's Office as part of Discovery, or received them from the prison's response to court orders to compel production of documents. (Id.) Declarations were provided by the declarant and adhere to Fed. R. Evid. 902(1)(A). (Id.)

## VI. LEGAL STANDARDS

### A. Eighth Amendment Medical Care Claim

The Eighth Amendment's prohibition against cruel and unusual punishment protects prisoners not only from inhumane methods of punishment but also from inhumane conditions of confinement. Morgan v. Morgensen, 465 F.3d 1041, 1045 (9th Cir. 2006) (citing Farmer v. Brennan, 511 U.S. 825, 847, 114 S.Ct. 1970 (1994) and Rhodes v. Chapman, 452 U.S. 337, 347, 101 S.Ct. 2392 (1981)) (quotation marks omitted). While conditions of confinement may be, and often are, restrictive and harsh, they must not involve the wanton and unnecessary infliction of pain. Morgan, 465 F.3d at 1045 (citing Rhodes, 452 U.S. at 347) (quotation marks omitted). Thus, conditions which are devoid of legitimate penological purpose or contrary to evolving standards of decency that mark the progress of a maturing society violate the Eighth Amendment. Morgan, 465 F.3d at 1045 (quotation marks and citations omitted); Hope v. Pelzer, 536 U.S. 730, 737, 122 S.Ct. 2508 (2002); Rhodes, 452 U.S. at 346. Prison officials have a duty to ensure that prisoners are provided adequate shelter, food, clothing, sanitation, medical care, and personal safety, Johnson v. Lewis, 217 F.3d 726, 731 (9th Cir. 2000) (quotation marks and citations omitted), but not every injury that a prisoner sustains while in prison represents a constitutional violation, Morgan, 465 F.3d at 1045 (quotation marks omitted).

While the Eighth Amendment of the United States Constitution entitles Plaintiff to medical care, the Eighth Amendment is violated only when a prison official acts with deliberate indifference to an inmate's serious medical needs. Snow v. McDaniel, 681 F.3d 978, 985 (9th Cir. 2012), overruled in part on other grounds, Peralta v. Dillard, 744 F.3d 1076, 1082-83 (9th

Cir. 2014); Wilhelm v. Rotman, 680 F.3d 1113, 1122 (9th Cir. 2012); Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006). Deliberate indifference is shown by "(a) a purposeful act or failure to respond to a prisoner's pain or possible medical need, and (b) harm caused by the indifference." Wilhelm, 680 F.3d at 1122 (citing Jett, 439 F.3d at 1096). The requisite state of mind is one of subjective recklessness, which entails more than ordinary lack of due care. Snow, 681 F.3d at 985 (citation and quotation marks omitted), Wilhelm, 680 F.3d at 1122. Deliberate indifference may be manifested "when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care." Id. Where a prisoner is alleging a delay in receiving medical treatment, the delay must have led to further harm in order for the prisoner to make a claim of deliberate indifference to serious medical needs. McGuckin v. Smith, 974 F.2d 1050, 1060 (9th Cir. 1992), overruled on other grounds by WMX Techs., Inc. v. Miller, 104 F.3d 1133 (9th Cir. 1997), (citing Shapely v. Nevada Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985)).

"Deliberate indifference is a high legal standard." Toguchi v. Chung, 391 F.3d 1051, 1060 (9th Cir. 2004). "Under this standard, the prison official must not only 'be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists,' but that person 'must also draw the inference.'" Id. at 1057 (quoting Farmer, 511 U.S. at 837. "'If a prison official should have been aware of the risk, but was not, then the official has not violated the Eighth Amendment, no matter how severe the risk.'" Id. (quoting Gibson v. County of Washoe, Nevada, 290 F.3d 1175, 1188 (9th Cir. 2002)). "A showing of medical malpractice or negligence is insufficient to establish a constitutional deprivation under the Eighth Amendment." Id. at 1060. "[E]ven gross negligence is insufficient to establish a constitutional violation." Id. (citing Wood v. Housewright, 900 F.2d 1332, 1334 (9th Cir. 1990)).

"A difference of opinion between a prisoner-patient and prison medical authorities regarding treatment does not give rise to a § 1983 claim." Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981) (internal citation omitted). To prevail, a plaintiff "must show that the

course of treatment the doctors chose was medically unacceptable under the circumstances . . . and . . . that they chose this course in conscious disregard of an excessive risk to plaintiff's health." Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996) (internal citations omitted).

**B.    State-law Negligence**

"Under California law, '[t]he elements of negligence are: (1) defendant's obligation to conform to a certain standard of conduct for the protection of others against unreasonable risks (duty); (2) failure to conform to that standard (breach of duty); (3) a reasonably close connection between the defendant's conduct and resulting injuries (proximate cause); and (4) actual loss (damages).'"   Corales v. Bennett, 567 F.3d 554, 572 (9th Cir. 2009) (quoting McGarry v. Sax, 158 Cal.App.4th 983, 994, 70 Cal.Rptr.3d 519 (2008) (internal quotations omitted)).

**VII.    FINDINGS**

**A.    Eighth Amendment Medical Claim**

**1.    Objective Element – Existence of Serious Medical Need**

A "serious medical need" exists if the failure to treat a prisoner's condition could result in further significant injury or the "unnecessary and wanton infliction of pain." McGuckin, 974 F.2d at 1059.  Indications of a serious medical need are (1) the existence of an injury that a reasonable doctor would find important and worthy of comment or treatment, (2) the presence of a medical condition that significantly affects an individual's daily activities, and/or (3) the existence of chronic or substantial pain.  Snow, 681 F.3d at 982-85 (objectively serious medical need existed where prisoner who needed double hip replacement surgery endured a years-long delay and his degenerated condition caused him excruciating pain and rendered him barely able to walk); Wilhelm, 680 F.3d at 1122 (hernia constituted objectively serious medical need where it caused the prisoner pain and he endured an approximately 4 year delay before receiving necessary surgery); Lopez v. Smith, 203 F.3d 1122, 1131 (9th Cir. 2000) (objectively serious medical need existed where prisoner's broken jaw was wired shut for months, affecting his ability to eat and likely causing him pain) (quotation marks omitted); see also McGuckin, 974 F.2d at 1059-62 (objectively serious medical need existed where prisoner endured a more than

3 ½ year delay in receiving back surgery for "dramatic" condition "constituting massive herniation" of inmate's back and upper torso, which caused inmate extreme, increasing pain which was successfully treated by the surgery); Hunt v. Dental Dept., 865 F.2d 198, 200 (9th Cir. 1989) (objectively serious medical need existed where prisoner went more than 3 months without his dentures, resulting in severe pain, bleeding gums, broken and permanently damaged teeth, and weight loss due to inability to eat properly); Doty v. County of Lassen, 37 F.3d 540, 546 n.3 (9th Cir. 1994) (no objectively serious medical need where prisoner suffered from nausea, shakes, headache, and depressed appetite due to unresolved family stress).

Defendant argues that Plaintiff's symptoms were expected after the type of surgery he had. Defendant's expert witness, Dr. Ugwueze, declares that Plaintiff's symptoms -- pain, constipation, and bleeding – would be expected following a hemorrhoidectomy, and resolution of acute pain following hemorrhoidectomy may take several days to a couple of weeks. (Ugwueze Decl., ECF 208-5 ¶8.) Plaintiff alleged in the SAC that on January 2, 2010, he was just out of surgery, in severe pain, had not had a bowel movement in three days, and was bleeding profusely from the rectum. (SAC, ECF No. 140 at 19:11, 28:26-29:1.) Plaintiff's report of severe pain, profuse bleeding, and constipation are facts within a lay witness' perception and do not require medical expertise, Fed. R. Evid. 701, and these symptoms would significantly affect an individual's daily activities. Thus, even if acute pain is expected after hemorrhoidectomy surgery, there is no doubt that Plaintiff's pain and medical condition demonstrated a "serious medical need" under the applicable definition, and that the unnecessary continuation of his condition and pain would cause him "harm" upon which a § 1983 claim can be based. McGuckin, 974 F.2d at 1062.

### 2. Subjective Element – Deliberate Indifference

#### a. Failure to Provide Medication on January 2, 2010

The court finds, however, no evidence that defendant Adair was deliberately indifferent when she refused to provide Plaintiff with his medication at the A-L window on January 2, 2010, even if Plaintiff's name was on the pick-up list for medication.

///

Defendant Adair does not recall interacting with Plaintiff on January 2, 2010; does not recall Plaintiff presenting with active bleeding or other urgent symptoms; does not recall Plaintiff showing her any documentation regarding treatment or a prescription being ready; and does not recall Plaintiff requesting further treatment or evaluation in the clinic. (Adair Decl., ECF 224-4 ¶5.) However, Defendant does not dispute that on January 2, 2010, Plaintiff approached the A-L window at the medical clinic and requested medication, and that she [Adair] informed Plaintiff that no medication was available for him and ordered him away from the window. (D's Stmt of Facts, ECF. No 224-2 ¶¶4, 5.) Defendant asserts that one of her duties on January 2, 2010 was to dispense medications to inmates whose names were listed on the 1-2-10 medication for pick-up list posted outside E medical clinic. (Adair's Responses to Plaintiff's Req. for Admissions, Set One, number 1, ECF No. 238 at 164.) Adair declares that if the prescribed medication was at the clinic, ready for distribution, and that if Plaintiff was on the distribution list, he would have been given the medication. (Adair Decl. ¶6).

Defendant offers evidence that Plaintiff's medication had not been delivered to the medical clinic and thus was not available for defendant Adair to dispense. A notation on the January 2, 2010, Nurse's Log, signed by defendant Adair, states, "LVN Kush came from F yard at 2000 unable to deliver KOP's 4 boxes undelivered." (ECF No. 224-3 at 7.) Plaintiff's medications would have been KOP or "Keep On Person" medications. (P's Response, ECF No. 238 at 5:27-28.)

Plaintiff contends that his medication was at the clinic awaiting delivery, but Defendant Adair refused to provide it to Plaintiff. (Id. at 66:4-5.) In support, Plaintiff's asserts that his name was listed on the medications list for that day, medications had been prescribed for him post-surgery, and Defendant's behavior (shouting at him) showed malice. Plaintiff offers no evidence to support his speculation that the medication was actually there on January 2, 2010, and Defendant has shown evidence that the medication was not there. Without evidence that Defendant had access to the medication, Plaintiff cannot show that Defendant acted unreasonably in refusing him the medication.

///

### b.    Failure to Admit Plaintiff for Medical Evaluation

The court also finds no evidence that Defendant acted with deliberate indifference when she failed to admit Plaintiff to the clinic for medical evaluation or treatment on January 2, 2010.

The parties do not dispute that when an inmate comes to the medical window expressing the need for medical attention, part of Defendant's job is to ensure the inmate is seen by someone capable of evaluating whether the inmate's medical needs necessitate a higher level of care. (Adair's Responses to Plaintiff's Req. for Admissions, Set One, number 11, ECF No. 238 at 168-69.) Defendant Adair also agreed that "in general," when an inmate/patient requests to check into the medical clinic at E Yard SATF Corcoran prison, "the inmate/patient would be seen by a health care professional regarding the complaint." (Adair's Responses to Plaintiff's Interrogatories, Set One, number 9, ECF No. 238 at 155.) However, Defendant has no recollection of her encounter with Plaintiff at the window on January 2, 2010. (Adair Decl., ECF No. 224-4 at 2 ¶5.)

Plaintiff's evidence includes his assertions in the verified SAC.

> Defendant Adair said I had no medications. Plaintiff pointed to his name on the list and said he had just had surgery and must have medication. Defendant Adair became angry and told the plaintiff to "get away from the window," that he had no meds. I then responded that I was bleeding from the rectum, in pain and hadn't had a bowel movement in three days. I asked to "check into" medical or go either to CTC or a Hospital. Defendant Adair again angrily told plaintiff to leave the area. C/O Perez then became involved and angrily told the plaintiff to get away from the window. I then replied, "But I'm bleeding from the rectum." . . . I again refused to leave the area and said, "I want to check into medical." C/O Perez then ordered the plaintiff to return to his housing unit or receive a 115 disciplinary write up.

(SAC, ECF No. 140 at 46 ¶103-47 ¶114.)

Plaintiff also offers inmate Shawn Burton's account of the events at issue.

> On the afternoon of Jan. 2, 2010 I was standing in the medication pick up line on E yard at SATF with inmate "Butch" Dasenbrock. I observed inmate Dasenbrock approach the medication window at E clinic and overheard him being told by the nurse he had no meds. I heard Dasenbrock say he was on the medication pickup list, so he must have meds. He also said he was just out of surgery. The nurse then became angry and yelled at Dasenbrock to get away from the window. I heard Dasenbrock say there was something wrong, he was bleeding from the rectum and he wanted to see a doctor. Correctional Officer Perez then yelled at Dasenbrock from inside the E Clinic and ordered him to leave medical or he would receive a 115. Inmate Dasenbrock replied that he was bleeding from the rectum and just out of surgery. He said he wanted to go

18

to CTC or see a doctor.  C/O Perez again yelled at Dasenbrock to leave the window and said he would be given a 115.

(Burton Decl., ECF No. 238 at 72-73.)

While inmate Burton's declaration supports Plaintiff's assertion that he told Defendant about his symptoms, there is no evidence that Defendant drew the inference that Plaintiff was at a substantial risk of serious harm unless he received immediate medical evaluation or treatment.  Even if Defendant should have drawn the inference but did not, this does not show deliberate indifference.  Such conduct would, at most, show that Defendant was negligent.  Plaintiff asserts that Defendant demonstrated her malicious state of mind when she shouted at him.  However, shouting at Plaintiff, without more, is not evidence that Defendant was aware of a substantial risk of harm to Plaintiff.

### 3.  <u>Injury and Damages</u>

Defendant argues that Plaintiff cannot demonstrate that the delay in his medication led to further harm to Plaintiff, or that Plaintiff suffered damages as a result of lawful conduct by Defendant Adair.

When a prisoner is alleging that the delay of medical treatment evinces deliberate indifference, the prisoner must show the delay caused significant harm, and that the defendants should have known such harm would occur.  <u>Hallett v. Morgan</u>, 296 F.3d 732, 746 (9th Cir. 2008).

Defendant's expert witness, Dr. Ugwueze, Chief Medical Executive at SATF, concluded that Plaintiff healed from the surgery within the recommended timeframe and resumed normal daily activities:

> I have been asked by defense counsel to review Dasenbrock's treatment records from December 2009 to February 2010, to determine if there are any injuries stemming from the alleged deliberate indifference or negligence by Perez-Hernandez.  In reviewing Dasenbrock's UHR following his return from the hospital after his hemorrhoidectomy, I found and relied upon the following when making my conclusion:
>
> a)      Dasenbrock's hemorrhoidectomy was performed on December 30, 2009.
>
> b)      On December 31, 2009, Dasenbrock received Motrin and Tylenol No. 3 to treat his pain.
>
> c)      Dasenbrock received an antibiotic, Cephalexin on December 31, 2009.

d)  Dr. Metts prescribed Tucks adult briefs on December 31, 2009.

e)  On January 5, 2010, Plaintiff received Tylenol No. 3 for pain.

f)  On January 7, 2010, Plaintiff refused treatment while making no mention of exacerbated symptoms stemming from a delay in access to a prescription.

g)  At a January 13, 2010 follow-up appointment, Plaintiff did not complain of exacerbated hemorrhoids issues, and still suffered from occasional rectal bleeding. Dasenbrock was encouraged to increase his water intake from sixteen ounces daily.

h)  On February 3, 2010, Dasenbrock presented with no complaints and minimal swelling to the rectal area. The tissue healed well from the hemorrhoidectomy.

. . . I did not see any complications in healing stemming from the alleged delay of medication on January 2, 2010. If there were complications in the healing process, I would expect to see records noting continued swelling and excessive bleeding, discomfort, and other anal discharges. Notably, no records corroborating these issues were present. . . I did not see any adjustments in post-op care that would indicate any damage sustained in the recovery process. . . I found nothing in Dasenbrock's UHR [Unit Health Record] from January or February 2010 to corroborate his claims of deliberate indifference or negligence to post-op treatment.

(Ugwuege Decl., ECF No. 285-5 ¶¶6-13.)

Plaintiff asserts that he complained to doctors of post-op issues during follow-up appointments into February 2010, and that he did not recover under the acceptable recovery time for hemorrhoids. However, Plaintiff's medical records from November 18, 2009, to February 12, 2010, support Dr. Ugwueze's opinion.[7] (Declaration of Nicole L. Jones, Exh. B, ECF No. 224-3 at 8-38.) Moreover, Plaintiff is not qualified to express a medical opinion about whether he recovered within an acceptable recovery time. Fed. R. Evid. 701.

Plaintiff argues that he had to spend the night in severe pain and bleeding because no medical help was given to him on January 2, 2010. (SAC, ECF No. 140 at 29:18-19.) The next morning, January 3, 2010, when Plaintiff went to the medical window, his antibiotics, dated the day before, were given to him. There is no evidence that any other medication, besides antibiotics, was expected to be delivered to the clinic for distribution to Plaintiff on January 2.

_____

[7] The court notes that Defendant has raised objections on authentication grounds against some of Plaintiff's documentary evidence. If the court refers to any of Plaintiff's evidence that has been objected to, by implication the objection is overruled.

If defendant Adair had distributed Plaintiff's medication to him on January 2, Plaintiff would have only received antibiotics, which would not have relieved his constipation, pain, or bleeding. Therefore, Plaintiff's suffering during the night of January 2, 2010, was not a result of defendant Adair's failure to dispense Plaintiff's medication.

There also is no evidence that further medical evaluation at the clinic on January 2, 2010, would have relieved Plaintiff's symptoms. Plaintiff's bleeding continued for months after his surgery, and his constipation recurred in time, even under doctor's care. Plaintiff alleges that he felt better the next day, January 3, 2010, after an enema, but he did not receive pain medications until days later, through no fault of Defendant. There is no disagreement that recovery from a hemorrhoidectomy is painful and takes time. On January 2, 2010, Plaintiff had only been released from the hospital following surgery three days earlier, was still under doctor's care, and had been prescribed a lay-in and medications by the surgeon. There is no evidence that evaluation at the clinic would have changed his post-surgery regimen.

Plaintiff also alleges that because of his blood loss, he developed severe anemia with resulting heart complications – sharp stabbing pains in the chest, shortness of breath, dizziness, tiredness, weakness, etc. – and on February 19, 2010, Plaintiff had to be rushed to the Bakersfield Hospital emergency room for life-saving blood transfusions. (Id. at 24:9-13, 34:7-10.) Plaintiff declares:

> On February 2, 2010, the Plaintiff submitted a CDCR 7362 form to SATF medical documenting his complaints of shortness of breath and dizziness (the Plaintiff was on chronic care for his heart). (ECF No. 238 at 60¶19(e), Exh. at 84.) Dr. Metts told the Plaintiff on 9-3-10 that severe loss of blood can bring about these symptoms. (SAC, ECF No. 140 at 65:6-7.)

However, there is no admissible evidence showing that one night without treatment on January 2, 2010, caused Plaintiff to experience severe blood loss, bringing about shortness of breath and dizziness more than a month later.

Based on the admissible evidence, the court does not find that any conduct by defendant Adair on January 2, 2010, caused Plaintiff's later harm. Defendant has met her burden of setting forth evidence that there is no genuine issue of

///

material fact for trial, which shifts the burden to Plaintiff to submit admissible evidence showing the existence of genuine issues for trial. Plaintiff has not done so.

### 4. Conclusion

In sum, the record does not support a claim under the Eighth Amendment against defendant Adair based on deliberate indifference against Plaintiff on January 2, 2010.

### B. Negligence

Plaintiff also proceeds with a state negligence claim against defendant Adair based on the allegations in the Second Amended Complaint. "[A court] may decline to exercise supplemental jurisdiction over a claim . . . if . . . [it] has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). If the court grants defendant Adair's motion for summary judgment on Plaintiff's federal claims against her, the court should decline to exercise supplemental jurisdiction over Plaintiff's state law claims against her. See Sanford v. MemberWorks, Inc., 625 F.3d 550, 561 (9th Cir. 2010). ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." (internal quotation marks and citation omitted)).

Defendant argues that Plaintiff cannot show that defendant Adair breached any duty she owed to Plaintiff on January 2, 2010, in failing to provide him with his medications and allowing Officer Perez to removed Plaintiff from the medical facility. Defendant asserts that Plaintiff received all of the medical treatment available to him, because the medications were not available for pick-up, and it is outside the scope of Defendant's job to order further treatment on behalf of Plaintiff or alter Plaintiff's post-op treatment. (Adair Decl. ¶¶4, 7, 8; Jones Decl. ¶2; Exh. A.)

Defendant also argues that Nurse Cushing, rather than Defendant, was responsible for disbursing the KOP medications, which included the medication Plaintiff was attempting to obtain. (Adair Decl. ¶7; Jones Decl. ¶2; Exh. A.) Additionally, Defendant argues that there is no indication that defendant Adair was aware of any medical need or that Plaintiff confronted

him with serious medical concerns. Defendant argues that Plaintiff cannot demonstrate that the delay in receipt of medication was because of any duty Adair owed him.

Defendant also argues that Plaintiff cannot show that any resultant harm was proximately caused by Defendant's alleged failure to provide him with medication, which the records indicate was not available for disbursement, (Adair Decl. ¶¶7, 8; Jones Decl. ¶2; Exh. A), and the subsequent delay of three days until Plaintiff received his medications on January 5, 2010 did not cause him any harm, (ECF No. 208-5 ¶¶7, 8, 10, 13; Jones Decl. ¶3; Exh. B).

The parties agree that part of defendant Adair's duties on January 2, 2010, was to distribute medications to inmates whose names were written on the pick-up list, and to refer inmates with urgent medical needs to medical personnel at the clinic. Plaintiff argues that Defendant had a duty to provide him with medication because his name was written on the pick-up list, and a duty to refer him to medical personnel because he informed her of his urgent medical needs. Plaintiff also contends that Defendant had a duty to follow CDCR Nursing Protocols, which provide that a patient is supposed to be assessed for the urgency of the complaint, (P's Response, ECF No. 238 at 7, Exhs. at 74-76), and "if urgent the patient shall be taken to an examination room for evaluation and a complete assessment performed, including vital signs," (Id., Exh. at 75). Plaintiff also argues that he spent the night bleeding and in pain because defendant Adair breached her duties.

However, the court's findings that Plaintiff's medication was not available for defendant Adair to dispense, that defendant Adair was not aware that Plaintiff had urgent medical needs, that the delay in medication did not cause further harm to Plaintiff, and that Plaintiff did not suffer damages as a result of defendant Adair's conduct, cannot be reconciled with a finding that Plaintiff breached her duty to Plaintiff, causing him injury and damages. Accordingly, Defendant is entitled to judgment on Plaintiff's negligence claim.

## VIII.   CONCLUSION AND RECOMMENDATIONS

Defendant Adair has submitted evidence that she did not act with deliberate indifference or negligence when interacting with Plaintiff at the medical window on January 2, 2010, and Plaintiff did not produce any evidence in response that created a disputed issue of material fact.

Accordingly, Defendant is entitled to judgment on Plaintiff's claims against her, and Defendant's motion for summary judgment, filed on April 14, 2017, should be granted.

Accordingly, based on the foregoing, **IT IS HEREBY RECOMMENDED** that:

1.      Defendant Adair's motion for summary judgment, filed on April 14, 2017, be GRANTED; and

2.      Judgment be entered in favor of Defendant Adair; and

3.      This case proceed only against defendants Dr. A. Enenmoh, Correctional Officer Perez-Hernandez, and Nurse Page, on Plaintiff's claims for violation of the Eighth Amendment and related state-law negligence.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within **fourteen (14) days** after the date of service of these findings and recommendations, any party may file written objections with the court.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within **fourteen (14) days** after the date the objections are filed.  The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal.  Wilkerson v. Wheeler, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **November 15, 2017**                    **/s/ Gary S. Austin**
                                                   UNITED STATES MAGISTRATE JUDGE